23931

The STATE, Respondent v. Edward Lee GUNN, Sr., Evelyn Gunn, Harold Glenn Moss, Robert Earl Childers, Ronald Clayton Carpenter, Hazel Ruby Carpenter, Edward Joe Smith, Kenneth Lee Smith, James Clifford Smith and Olin Dewitt Thompson, Appellants.

(437 S.E. (2d) 75)

Supreme Court

*Dallas D. Ball*, Pickens, *for appellants Edward Lee Gunn, Sr.* and *Evelyn Gunn.*

*Chief Appellate Defender Daniel T. Stacey*, and *Chief Deputy Appellate Defender Joseph L. Savitz, III*, both of *S.C. Office of Appellate Defense*, Columbia, *for appellant Harold Glenn Moss.*

*Melvin L. Roberts*, York, *for appellant Robert Earl Childers.*

*F. Patrick Hubbard*, Columbia; and *Keith A. Gatlin*, Rock Hill, *for appellants Ronald Clayton Carpenter, Hazel Ruby Carpenter, Edward Joe Smith, Kenneth Lee Smith* and *James Clifford Smith.*

*Randall M. Chastain*, Columbia, and *Edward E. Saleeby, Jr.*, Hartsville, *for appellant Olin Dewitt Thompson.*

*Atty. Gen. T. Travis Medlock, Chief Deputy Attys. Gen. Cameron M. Currie* and *Donald J. Zelenka, Asst. Atty. Gen. Tracy A. Meyers,* Columbia, *for respondent.*

Heard March 11, 1993.

Filed Aug. 30, 1993. Refiled Sept. 28, 1993.

CHANDLER, Justice:

This is a State Grand Jury conspiracy case involving the drug Dilaudid.[1] Count one of the thirty-count indictment alleged thirty-three named defendants conspired with others to traffic in Dilaudid in York and Cherokee counties between 1982 and 1989, while counts two-thirty alleged substantive trafficking offenses. Thirteen of the thirty-three conspiracy defendants went to trial; ten were convicted. This appeal consolidates the appeals of those ten individuals. In addition, appellant Lee Gunn was convicted of sixteen counts of trafficking Dilaudid and appellant Harold Moss was convicted on five substantive counts. The issues on appeal are the sufficiency of the conspiracy indictment, the sufficiency of the evidence on that charge, the sufficiency of jurisdictional allegations in the substantive trafficking counts, the trial court's refusal to allow the impeachment of a prosecuting witness, and the trial court's refusal of a jurisdictional jury charge. We vacate Gunn's and Moss's substantive convictions for lack of jurisdiction, but affirm their conspiracy convictions as well as those of appellants Evelyn Gunn and Earl Childers. The conspiracy convictions of the remaining six appellants are reversed for insufficient evidence.[2]

A. *Sufficiency of Conspiracy Count*

The State chose to indict thirty-three individuals for a conspiracy alleged to have spanned more than seven years. The indictment itself gives no indication of the State's theory or any specifics involved in the conspiracy but instead simply incorporates the language of the trafficking statute in most of its many permutations:

---

[1] A painkiller derived from morphine.

[2] Those six appellants are Ronald Clayton Carpenter, Hazel Ruby Carpenter, Edward Joe Smith, Kenneth Lee Smith, James Clifford Smith, and Olin Dewitt Thompson.

## Count One—Conspiracy

### (Trafficking in Illegal Drugs—Dilaudid)
### S.C. Code Ann. Section 44-53-370(e)(3)(c)

That Lee Edward Gunn, Evelyn S. Gunn, Olin DeWitt Thompson a/k/a "Big O", Bruce Walter Hodges, Robert Francis Leggeri a/k/a "Otis", Olin Daniel Martin, Charles E. Martin a/k/a "Charlie", Lee Edward Gunn Jr. a/k/a "Junior," Harold Glenn Moss, Barbara Roxanne Gregory, Robert Earl Childers a/k/a "Sherman", James Clifford Smith, Joe Billy Barrett a/k/a "Bill", a/k/a James David Goodman, Sandra Mayo Mason a/k/a "Sandy", Rodney R. Wagenknecht a/k/a "Possum", Wade Hampton Bright, Jr., Patricia Suzanne Wiley La Barbera, Joseph R. La Barbera, Willie Mae Gregory a/k/a "Billie", Sabrina Rochelle Gregory, Cindy Deese Faile, Christopher Lynn Hunsucker a/k/a "Chris", Betty Sapp Hinson, Melanie Diane Griffin, Melody Dawn Pelzer, Bobby Wade Collins, Frank Soda, Jr., Robert Preston Algeo a/k/a "Bob", Ronald Clayton Carpenter, Hazel Ruby Carpenter, Edward Joe Smith, Kenneth Lee Smith and Timothy Lee Millwood did in Cherokee and York counties, from on or about early 1982 up to and including the date of this indictment, knowingly, unlawfully and willfully conspire, confederate, agree and have tacit understanding with each other and/or other persons, whose name are both known and unknown to the State Grand Jurors, for the purpose of selling, delivering, or bringing into this State in Cherokee and York counties, or providing financial assistance or otherwise aiding and abetting the sale, delivery or bringing into this State in Cherokee and York counties, or the knowing actual or constructive possession in Cherokee and York counties of more than 28 grams of Dilaudid, a narcotic, a derivative of morphine, which is a controlled substance under provisions of Section 44-53-210, Code of Laws of South Carolina (1976), as amended, such conduct not having been authorized by law.

The first issue we address is appellants' contention that this count of the indictment is so vague and overbroad that the trial court should have granted their motion to quash. We disagree.

"It is not necessary to detail the evidence of the conspiracy in the indictment nor to recite the facts connecting all the ac-

cused with one another in the web of the conspiracy, nor to describe the conspiracy with the same degree of particularity required in describing a substantive offense." *State v. McIntire*, 221 S.C. 504, 71 S.E. (2d) 410 (1952). A review of other conspiracy indictments challenged for overbreadth or vagueness shows, however, that those indictments contained more specific allegations than the general indictment here. *See, e.g., State v. Sweat*, 276 S.C. 448, 279 S.E. (2d) 375 (1981); *State v. Fleming*, 243 S.C. 265, 133 S.E. (2d) 800 (1963); *State v. McIntire, supra;* and *State v. Hightower*, 221 S.C. 91, 69 S.E. (2d) 363 (1952). It is questionable whether this indictment *on its face* sufficiently apprised the appellants of the charges against them.

It is well settled, however, that in viewing the sufficiency of an indictment we must look at the issue with a practical eye in view of the surrounding circumstances. *State v. Adams*, 277 S.C. 115, 283 S.E. (2d) 582 (1981). This indictment was returned by the State Grand Jury. Under its specialized procedure, a defendant is permitted to review, and to reproduce, the transcript of the testimony of the witnesses who appeared before the Grand Jury. S.C. Code Ann. § 14-7-1700 (Supp. 1992). In light of the availability of this evidence to these appellants, we hold that this count of the indictment is not fatally vague or overbroad.

B. *Sufficiency of Substantive Offense Allegations*

Appellant Lee Gunn was convicted of sixteen substantive Dilaudid trafficking offenses and appellant Moss of five counts. The counts alleging these crimes do not contain any allegation that the crimes either transpired in more than one county or had impact in more than one county. Accordingly, these counts do not sufficiently allege jurisdiction. *State v. Wilson*, Op. No. 23910 — S.C. —, 433 S.E. (2d) 864 (S.C. Sup. Ct. filed July 19, 1993) (Davis Adv. Sh. 20 at p. 25). These convictions and sentences are vacated.[3]

C. *Sufficiency of Conspiracy Evidence*

Count One alleges a *single conspiracy* among at least thirty-three individuals to traffic in Dilaudid in York and Cherokee counties. Under our view of the evi-

---

[3] There is no such jurisdictional defect in the conspiracy count which alleges the conspiracy took place in two counties.

dence, the State proved multiple conspiracies, only one of which ("The Gunn Conspiracy") was alleged in the indictment. Accordingly, we hold there was sufficient evidence to submit to the jury the conspiracy charges of those involved in the Gunn Conspiracy. We reverse the convictions of those who are not co-conspirators in that crime, holding they were entitled to directed verdicts of acquittal. A review of the evidence and the law relevant to conspiracy is necessary to explain our conclusion.

The evidence showed that defendant Bobby Wade Collins,[4] a York County resident, was a major Dilaudid distributor in the Rock Hill-Charlotte area between 1982 and 1985. Collins purchased Dilaudid in Detroit and Florida, and sold it to defendant Joe Billy Barrett, a large-scale dealer in Charlotte, and to appellant Ken Smith in York County, and to appellant Ed Smith in North Carolina. During this period Collins's girlfriend was defendant Roxanne Gregory (Roxanne), a Dilaudid addict. There is no evidence connecting Collins to the Gunn Conspiracy.

Defendant Cindy Deese Faile (Cindy) was addicted to Dilaudid in 1980. Cindy and defendant Chris Hunsucker (Chris) were members of a Rock Hill group who produced counterfeit drugs and sold them at rock concerts up and down the East Coast. In 1985 Chris and Cindy met a Dilaudid dealer at a Philadelphia concert. Cindy testified she was romantically involved with appellant Moss at this time. Later, in 1986, she'introduced Moss and his friend, appellant Lee Gunn, to the Philadelphia connection. She made several trips to Philadelphia with Lee Gunn and Moss to purchase Dilaudids; her payment was always several pills. Eventually, Cindy was "cut out" of the Philadelphia deal.

Lee Gunn and Harold Moss made a connection with Randy Klinger, the supplier for their original Philadelphia Dilaudid source. Moss was living them with Roxanne, Collins's former girlfriend. Roxanne testified that she made trips to Philadelphia and Florida with Lee Gunn and Moss to purchase large quantities of Dilaudids for distribution in North and South Carolina during 1986 and 1987. Moss and Lee Gunn ceased

---

[4] Persons charged in the indictment who pled guilty or who were acquitted at trial are referred to in the opinion as defendants. Collins was acquitted.

their association in 1987 or 1988 when Moss learned Lee Gunn was making trips to Philadelphia behind his back. The evidence showed that appellant Earl Childers was a Dilaudid distributor for Lee Gunn, and that Lee's wife Evelyn was actively involved in the Gunn Conspiracy.

After Moss and Lee Gunn ceased doing business together in 1987 or 1988, each continued separately to import Dilaudid from Philadelphia from distribution and sale in North and South Carolina. During this period Bob and Martha Durbin made most of the trips to Philadelphia for Lee Gunn, while Moss, Roxanne, and members of her family transported the drug for Moss.

There is evidence in the record to support a finding that appellant Cliff Smith was a large-scale Dilaudid dealer in South Carolina during the 1980s, and that his brothers appellants Ed and Ken Smith, aided and abetted Cliff's Dilaudid business. According to the evidence, Cliffs source of drugs was "Tommy", and, on occasion, appellant Olin Thompson. Cliff also received drugs from Florida. There is no evidence to connect Cliff to the Gunn Conspiracy.

In addition, there is evidence in the record to support a finding that appellant Ronald Carpenter and his mother, appellant Hazel Ruby Carpenter, were major distributors of Dilaudid in the Charlotte area during the 1980s. The exact source of the Carpenters' drugs is unclear, although the evidence is susceptible of the inference that Cliff Smith may have supplied them, and that after Moss and Lee Gunn ceased being partners, Moss made more than one large sale to Ronnie Carpenter. The evidence is also clear that after 1986 defendant Joe Billy Barrett and especially defendant Sandra Mason were Lee Gunn's distributors in the Charlotte area, and that appellants Ronald and Hazel Carpenter were their main rivals.

Finally, there is evidence of several sales to appellant Olin Thompson, all of which took place in North Carolina. Only one sale was linked to Lee Gunn. There is also evidence Thompson may have sold Dilaudid to Cliff Smith.

There is evidence that most of those indicted sold drugs at one time or another to the same people, and evidence of occasional transactions between most of the major players. The issue, however, is whether the State's evidence proved the

single conspiracy alleged in the indictment, or whether the evidence showed a number of conspiracies. *Compare State v. Amerson,* Op. No. 23827, — S.C. —, 428 S.E. (2d) 871 (S.C. Sup. Ct. filed March 22, 1993); and *State v. Dasher,* 278 S.C. 454, 298 S.E. (2d) 215 (1982).

The State's theory placed Lee Gunn at the "hub" of the alleged conspiracy. In the State's opening argument, the Assistant Attorney General stated "[I]n so far as the South Carolina end of this conspiracy is concerned . . . Lee Gunn was at the head. . . ." The Assistant Attorney General acknowledged that Lee Gunn began to conspire in 1986, even though the indictment alleged the conspiracy commenced in 1982, and that Moss's agreement with Lee Gunn lasted only until 1987, but asserted Moss continued to traffic in Dilaudid independent of Lee Gunn after that time. The opening statement identified Cliff Smith as a distributor for Lee Gunn for a limited period of time,[5] and linked Cliff's brothers Ed and Ken to Cliff. Appellants Hazel and Ronnie Carpenter were identified as large-scale dealers, but no basis for linking them to the Gunn Conspiracy was suggested. Finally, appellant Thompson was identified as a person who occasionally purchased Dilaudid in North Carolina for resale.

We do not suggest that the State's opening argument was in any way evidence in the case, but it is the only device available under the circumstances for determining the State's theory. We discern that theory to be a wheel conspiracy,[6] with Lee Gunn at the "hub" and with spokes radiating to appellant Earl Childers, to appellant Cliff Smith, to appellant Olin Thompson, and to defendants Barrett and Mason. Moss was originally at the hub, but then split off into an independent arrangement with the Philadelphia suppliers. Cliff's brothers Ed and Ken are linked to Cliff, but the relationship between the Carpenters and Gunn, as well as that between certain other defendants, remains unexplained.

> A conspiracy is a combination or agreement between two or more persons for the purpose of accomplishing a criminal or unlawful object, or of achieving by criminal

---

[5] We find no evidence in the record to support this assertion.

[6] *See United States v. Kenny,* 645 F. (2d) 1323 (9th Cir. 1981), for a discussion of a wheel conspiracy.

or unlawful means an object that is neither criminal nor unlawful. *State v. Ameker*, 73 S.C. 330, 53 S.E. 484 (1906). The gravamen of the offense of conspiracy is the agreement or combination. *State v. Dasher, supra.* Thus, we focus here on the sufficiency of the evidence of an *agreement* between the alleged conspirators, and not, as the State would have us do, on the alleged common *object*, that is, the importation and distribution of Dilaudid in a defined geographic area. As the Tenth Circuit has said:

> What is required is a *shared*, single criminal objective, not just similar or parallel objectives between similarly situated people. . . . It is not enough that a group of people separately intend to distribute drugs in a single area, nor enough that their activities occasionally or sporadically place them in contact with each other. People in the same industry in the same locale (even competitors) can occasionally be expected to interact with each other without thereby becoming coconspirators. What is needed is proof they intended to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged. *United States v. Evans*, 970 F. (2d) 663 (10th Cir. 1992) (emphasis in original).

In reviewing the sufficiency of the evidence we view it, as we must, in the light most favorable to the State. *State v. Sullivan*, 277 S.C. 35, 282 S.E. (2d) 838 (1981). In viewing this evidence, however, we must exercise caution to ensure the proof is not obtained "by piling inference upon inference." *Direct Sales Co. v. United States*, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674 (1943). Proof of a buyer-seller relationship, without more, is inadequate to tie the buyer to a larger conspiracy, *United States v. Fox*, 902 F. (2d) 1508 (10th Cir. 1990), as is mere association with members of the conspiracy. *State v. Sullivan, supra.* This is so because "guilt . . . remains individual and personal . . . [and] is not a matter of mass application." *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). We agree, however, that "an agreement to distribute drugs can sometimes 'rationally be inferred' from 'frequent contacts' among the defendants and from 'their joint appearances at transactions and negotiations.' " *United States v. Evans, supra.*

In addition to relying on evidence of specific drug transactions between the alleged coconspirators, the State relies on phone records showing communication between them to prove the conspiracy. The defendants in this case share a common interest not only in Dilaudid, but in the car repair and sales business, and in the business of raising gamecocks. In addition, there is evidence of personal friendships between various defendants and their family members. Accordingly, under the circumstances of this case, we attach no evidentiary significance to the voluminous phone records showing contact between the alleged coconspirators since there is no evidence of the *content* of those calls.[7]

As we stated above, the evidence that during 1986 and 1987 appellants Lee Gunn, Moss, Evelyn Gunn and Childers conspired together to import and sell Dilaudid is sufficient to withstand their directed verdict motions. We find the only evidence in the record shows that appellant Moss withdrew from the conspiracy in 1987 or 1988, and that this withdrawal was communicated to all co-conspirators. *See State v. Woods,* 189 S.C. 281, 1 S.E. (2d) 190 (1939). Consequently, transactions between Moss and others after this time cannot be sued to connect those individuals to the Gunn Conspiracy. Accordingly, we do not consider the alleged sale to Olin Thompson in Gastonia, nor the alleged transactions between Moss and appellants Ronnie and Hazel Carpenter since they occurred after 1988. Unlike the State, we find no evidence that Moss ever rejoined the Gunn Conspiracy.

Reviewing the remaining evidence against Thompson, we find only evidence of a single possible sale by Gunn to Thompson near Grover, North Carolina. A single sale, without more, does not make Thompson part of the Gunn Conspiracy. *United States v. Fox, supra.* Thompson is entitled to a directed verdict.

We reach a similar conclusion with respect to appellants Ronnie and Hazel Carpenter. There is ample evidence they dealt in Dilaudid (mostly, we note, in North Carolina) but no evidence they were part of the Gunn Conspiracy. Similarly,

---

[7] We do find the phone tap evidence obtained in Philadelphia probative but we do not reach the admissibility of this particular evidence since it was cumulative to other evidence in the record. *State v. Blackburn,* 271 S.C. 324, 247 S.E. (2d) 334 (1978).

there is no evidence to connect the Smith brothers to the Gunn Conspiracy. These five appellants are entitled to directed verdicts.

Applying the test outlined in *State v. Amerson, supra,*[8] we hold the evidence showed several conspiracies where the indictment alleged only one. The State, relying on federal cases, argues that before any appellant is entitled to relief because of this variance between the crime charged and the offense proved, he must prove sufficient prejudice. This argument fails to comprehend the difference between federal and state law on the issue of variance. In South Carolina, "[i]t is a rule of universal observance in administering the criminal law that a defendant must be convicted, if convicted at all, of the particular offense charged in the bill of indictment." *State v. Cody,* 180 S.C. 417, 186 S.E. 165 (1936). A material variance between charge and proof entitles the defendant to a directed verdict; such a variance is not material if it "is not an element of the offense." *State v. Hiott,* 276 S.C. 72, 276 S.E. (2d) 163 (1981). Clearly a variance between the conspiracy charged and the conspiracy provided constitutes a material variance.

### D. *Prosecution Witness Impeachment*

The State's crucial witness was defendant Roxanne Gregory. As its brief acknowledges, "[a]ll Appellants, however, had one thing in common: all dealt direct with Roxanne Gregory. . . ." Appellants contend the trial court committed reversible error in refusing to allow them to inspect a SLED file and to use its contents to impeach Roxanne. We disagree.

In 1986, Roxanne's mother was arrested on drug charges. Her initial cash bond was reduced to a personal recognizance bond by a magistrate. Following a SLED investigation into this bond reduction, the magistrate resigned. During trial, appellants' counsel became aware of this incident, and of allegations that the SLED investigation found the bond reduction

---

[8] The factors to be applied in determining whether, in the totality of the circumstances, the proof shows one or more conspiracies are (1) the time periods involved; (2) the places where the conspiracy(ies) allegedly occurred; (3) the persons charged; (4) the overt acts or other descriptions of the offenses alleged which indicate the nature and scope of the activities being prosecuted; and (5) the substantive statutes alleged to have been violated.

came about after Roxanne agreed to a sexual encounter with the magistrate. Appellants sought to inspect the SLED file and to use its contents to impeach Roxanne.

The trial judge inspected the file *in camera* and refused to permit appellants access to it. He ruled the prejudicial content of the file outweighed its probative value, and held its impeachment value was merely cumulative to other available evidence impeaching Roxanne. He also ruled the material was not *Brady*[9] material. We disagree.

Impeachment evidence must be disclosed pursuant to a *Brady* request. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed. (2d) 481 (1985): *State v. Bryant*, 307 S.C. 458, 415 S.E. (2d) 806 (1992). Our review of this file convinces us that disclosure of it to the appellants would have provided them with a good-faith basis for seeking to impeach Roxanne for false swearing, if not for attempted bribery or bribery of a judicial officer. *See State v. McGuire*, 272 S.C. 547, 253 S.E. (2d) 103 (1979) (a witness may be impeached by past conduct which fairly tends to affect her credibility if the questioner has a good-faith basis for asking the question). The trial judge erred in weighing the evidence's prejudicial impact against its probative value where the issue was whether to allow a critical witness's, rather than a defendant's, impeachment.

The State argues, however, that the evidence in the SLED file was merely cumulative to other evidence impeaching Roxanne's credibility. At trial, she admitted she was a drug user, that she initially lied to officers about her knowledge and involvement in the Dilaudid business because she was a junkie, that she had prior convictions for possession of marijuana and forgery, and that when she was a junkie she would, and had, done anything to support her habit, including lying, cheating, stealing, and prostitution. Failure to disclose *Brady* material is reversible error only when its omission deprives the defendant of a fair trial. *State v. Thompson*, 276 S.C. 616, 281 S.E. (2d) 216 (1981). The exclusion of impeaching evidence is not prejudicial where it has no meaningful impact on a witness's credibility. *State v. Ferguson*, 300 S.C. 408, 388 S.E. (2d) 642 (1990). In light of the abundance of

[9] *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. (2d) 215 (1963).

other evidence detailing Roxanne's unabashed disrespect for the law, appellants cannot establish that the trial court's ruling denied then a fair trial. *State v. Thompson, supra; State v. Ferguson, supra.*

### E. *Jury Charge*

Appellants contend the trial court committed reversible error in refusing to charge the jury that, under the conspiracy count, it must find beyond a reasonable doubt the conspiracy in fact occurred in both York and Cherokee counties as alleged in the indictment before it could find them guilty of this charge. We disagree. While jurisdictional allegations must be proved by the State and ordinarily are submitted to the jury, it is well-settled that the failure to submit this question to the jury is not reversible error where there is no conflict in the evidence. *State v. Bostick*, 243 S.C. 14, 131 S.E. (2d) 841 (1963); *compare Posey v. State*, 250 S.C. 55, 156 S.E. (2d) 340 (1967); *State v. Henderson*, 285 S.C. 320, 329 S.E. (2d) 448 (Ct. App. 1985). Here, the undisputed evidence shows acts in furtherance of the conspiracy in both counties, as well as up and down the Eastern seaboard. The trial judge did not commit reversible error in refusing this request to charge. The conspiracy convictions of appellants Lee Gunn, Evelyn Gunn, Earl Childers, and Harold Moss are affirmed.

### F. *Conclusion*

We take this occasion to remind prosecutors of the pitfalls inherent in mass conspiracy trials. More than forty years ago this Court stated, "It is always cumbersome to try a great number of defendants at one time. . . . With such a large number [of defendants] there might be a danger of some of them being lost sight of by the jury, and their case considered by the jury in a vague way." *State v. McIntire, supra.*

Here, the State concedes the evidence produced at trial showed a number of "relationships intertwined in a confusing jumble of ways." As an appellate tribunal, we have had the opportunity to searchingly review the voluminous transcript generated by this prosecution, and to reflect upon the numerous issues raised. This was not a luxury afforded the trial judge or the jury. Separate indictments, with separate trials, and a sharper focus on the alleged conspirators' agreement,

would have aided in the refinement of the State's case. *See, e.g., United States v. Sperling,* 506 F. (2d) 1323 (2nd Cir. 1974).

As the United States Supreme Court cautioned:

> There are times when of necessity, because of the nature and scope of the particular federation, large numbers of persons taking part must be tried together or perhaps not at all, at any rate as respects some. When many conspire, they invite mass trial by their conduct. Even so, the proceedings are exceptional to our tradition and call for use of every safeguard to individualize each defendant in his relation to the mass. Wholly different is it with those who join together with only a few, though many others may be doing the same and though some of them may line up with more than one group.
>
> Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions. True, this may be inconvenient for prosecution. But our Government is not one of mere conveniences or efficiency. It too has a stake, with every citizen, in his being afford our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth.
>
> *Kotteakos v. United States supra.*

The State Grand Jury has undertaken a difficult mission, requiring the exercise of caution and discretion to insure justice is achieved.

We reverse the conspiracy convictions of appellants Olin Thompson, Ronnie Carpenter, Hazel Carpenter, Cliff Smith, Ed Smith, and Ken Smith for lack of evidence. We affirm the conspiracy convictions of appellants Lee Gunn, Evelyn Gunn, Harold Moss, and Earl Childers. We vacate the substantive trafficking convictions of appellants Lee Gunn and Harold Moss. Accordingly, these appeals are

Reversed in part, affirmed in part, and vacated in part.

HARWELL, C.J., CHANDLER, TOAL and MOORE, JJ., concur.

FINNEY, J., dissenting.

FINNEY, Justice (dissenting in part):

I respectfully dissent from so much of the majority opinion as affirms the conspiracy convictions of appellants Edward Lee Gunn, Sr., Evelyn Gunn, Earl Childers, and Harold Moss. I would reverse their convictions for conspiracy on the grounds that the trial judge erred in refusing to allow appellants to inspect a South Carolina Law Enforcement Division (SLED) file on prosecution witness Roxanne Gregory and to use evidence revealed in the file for the purpose of impeaching the witness.

The majority concedes error on the part of the trial judge in holding that the SLED file evidence was not subject to disclosure under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed. (2d) 215 (1963); and that the trial judge erred in weighing the prejudicial impact against the probative value of the controverted evidence where the issue was impeachment of a critical witness—instead of a defendant. *See United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed. (2d) 481 (1985); *State v. Bryant*, 307 S.C. 458, 415 S.E. (2d) 806 (1992); *State v. McGuire*, 272 S.C. 547, 253 S.E. (2d) 103 (1979). Nonetheless, the majority affirms based upon its finding that the appellants failed to establish prejudice by the trial court's rulings. The majority concludes that the excluded evidence was cumulative to other testimony by the witness that she was a drug user, had lied to police officers, and that when she was a junkie, she would do and had done anything to support her habit, including lying, cheating, stealing and prostitution.

The evidence at issue surrounds the arrest of Roxanne's mother in 1986 on drug charges and the magistrate's reduction of the mother's initial cash bond to a personal recognizance. The magistrate resigned after an ensuing SLED investigation. Evidence in the SLED file indicated that the bond was reduced after Roxanne agreed to a sexual encounter with the magistrate. The trial judge reviewed the evidence *in camera* and refused to allow the appellants to inspect the SLED file or to use evidence from the file to impeach Roxanne.

I discern a pivotal distinction between the specific, documented SLED file evidence and a broad, ambiguous admission

by an admitted drug user that she had lied about her involvement in the drug business, that she had prior drug-related and forgery convictions, and that she would do and had done anything to support her habit while she was a junkie.

Based upon a finding of cumulativeness, the trial court excluded the SLED file evidence—which tended to show that the witness had intentionally manipulated the judicial system to gain an advantage; that her questionable action had occurred even as the unlawful conspiracy was ongoing; and that there was an inference that she would engage in illegal or harmful conduct with a calculated, reckless disregard for the interests of others. Conversely, the admitted testimony that the trial court found to be ample on the issue of Roxanne's credibility constituted little more than a confession to the stereotypical vices generally associated with the chronic drug dependency of a "junkie."

I am convinced that any act tending to demonstrate a willingness to undermine the judicial system is far more egregious than other misdeeds and evinces a greater degree of culpability. In my view, the excluded evidence has unique relevance to Roxanne's character with regard to the case on trial, and the appellants were entitled to disclosure and use of the evidence for witness impeachment.

The complex, bloated prosecution growing out of this case spanning from 1982 to 1989, involving several states, multiple counties in South Carolina, and numerous individuals tended to obscure significant issues and resulted in a convoluted trial. However, two facts are clear and undisputed; one, that there was a single constant in the conspiracy—each of the appellants had dealings with Roxanne; and two, that Roxanne was a crucial witness for the state. Given the fact that a substantial portion of the evidence required to establish a conspiracy is—by nature—subjective, witness credibility assumes paramount importance in arriving at the truth. *See State v. Dasher*, 278 S.C. 454, 298 S.E. (2d) 215 (1982).

I would hold that the appellants were prejudiced by the trial court's failure to permit counsel for the appellants to examine the SLED file and that their inability to conduct impeaching cross-examination of Roxanne based upon pertinent evidence from the SLED file denied the appellants the right to a fair trial. I would reverse appellant's convictions for conspiracy.